UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MARKET DEVELOPMENT
CORPORATION,

       Plaintiff,

v.                                  CASE NO.:1:13-CV-00035-MW-GRJ

PARTNERSHIP 97, LTD,
a Florida limited partnership;
CLB, INC., a Florida corporation;
AMA GAINESVILLE INVESTMENTS
FOUR, LLC, a Florida limited liability
Company; and ALEX I. SKOBEL,
a Florida resident,

       Defendants.
_____/

## ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND CROSSCLAIMS

### I. ANSWER

COMES NOW, Defendants, AMA Gainesville Investments Four, LLC, a Florida

limited liability company ("AMA-4"), and Alex I. Skobel , a Florida resident ("Skobel"), by

and through its undersigned counsel, and hereby file this Answer, Affirmative Defenses,

Counterclaims and Crossclaims in response to the Complaint filed on or about February

14th, 2013 by Plaintiff, Market Development Corporation ("MDC") and hereby serve the

same on MDC and Defendants, Partnership 97, Ltd. ("P97") and CLB, Inc. ("CLB"). P97

and CLB shall be collectively referred to as P-97. Complaint Exhibit "1" shall be referred to

as the "Amended Contract." AMA-4 and Skobel respectfully allege as follows:

## PARTIES AND JURISDICTION

1.      Complaint Paragraph 1 Admitted.

2.      Complaint Paragraph 2 Admitted, but AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny the allegations or facts contained in paragraph 2 of the Complaint.

3.      Complaint Paragraph 3 is not directed to AMA-4 and Skobel, but to the extent an answer is nonetheless required, it is Admitted.

4.      Complaint Paragraph 4 Admitted.

5.      Complaint Paragraph 5 Admitted.

6.      Complaint Paragraph 6 Admitted for jurisdictional purposes only, but denied that MDC has any damages from AMA-4.

7.      Complaint Paragraph 7 Admitted.

8.      Complaint Paragraph 8 Denied.


## FACTUAL ALLEGATIONS

9.      Complaint Paragraph 9 without knowledge as to whether Plaintiff is a real estate development company, admitted to the remainder.

10.     Complaint Paragraph 10 Denied. AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny the facts contained in paragraph 10 of the Complaint.

11.     Complaint Paragraph 11 has facts or allegations of which AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny.

12.     Complaint Paragraph 12 has facts or allegations of which AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny.

13.     Complaint Paragraph 13 Admitted and hereinafter the Contract and the Amendment will be referred to collectively as the "Amended Contract."

14.     Complaint Paragraph 14 has facts or allegations of which AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny.

15.     Complaint Paragraph 15 Admitted that AMA-4 and Skobel have seen a proposed unsigned second amendment.  However, AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny whether it was sent on October 2nd, 2012.

16.     Complaint Paragraph 16 Denied.

17.     Complaint Paragraph 17 Denied.

18.     Complaint Paragraph 18 Admitted.

19.     Complaint Paragraph 19 Admitted.

20.     Complaint Paragraph 20 Denied.

21.     Complaint Paragraph 21 Denied.

22.     Complaint Paragraph 22 Denied.

23.     Complaint Paragraph 23 Denied.

24.     Complaint Paragraph 24 Denied that P-97 accepted the earnest money escrow arrangement. Admitted MDC responded to P-97 that the money was with Michael Schaaf.

25.     Complaint Paragraph 25 Admitted. MDC never complied with the request.

26.     Complaint Paragraph 26 Admitted that AMA-4 drafted a document that requested for the deposit money to be transferred to First American Title. P-97 signed document in agreement with its content.

27.     Complaint Paragraph 27 Admitted that escrow agreement was emailed and denied to the other allegations or facts.

28.     Complaint Paragraph 28 Denied.

29.     Complaint Paragraph 29 has facts or allegations of which AMA-4 and Skobel are without knowledge and/or information sufficient to either admit or deny.

30.     Complaint Paragraph 30 Denied. AMA-4 and Skobel refute the validity of the Complaint Exhibit "4" extension.

31.     Complaint Paragraph 31 Denied.

32.     Complaint Paragraph 32 Admitted.

33.     Complaint Paragraph 33 Denied.

34.     Complaint Paragraph 34 Denied.

35.     Complaint Paragraph 35 Denied.

36.     Complaint Paragraph 36 Denied.

37.     Complaint Paragraph 37 Denied.

38.     Complaint Paragraph 38 Denied.

39.     Complaint Paragraph 39 Denied.

40.     Complaint Paragraph 40 Denied.

41.    Complaint Paragraph 41 Denied.

42.    Complaint Paragraph 42 Denied.

## COUNT I

## BREACH OF CONTRACT AGAINST P-97, CLB, AND AMA-4 DAMAGES

43.    The answers contained in paragraphs 1-42 are incorporated herein by this reference as if fully restated.

44.    Complaint Paragraph 44 Admitted.

45.    Complaint Paragraph 45 Denied. AMA-4 had notice of Amended Contract but was not liable for the Amended Contract.

46.    Complaint Paragraph 46 Denied.

47.    Complaint Paragraph 47 Denied.

48.    Complaint Paragraph 48 Denied.

49.    Complaint Paragraph 49 Denied as to all parts except admitted that AMA-4 insisted on the execution of a new contract substantially similar to the Amended Contract.

50.    Complaint Paragraph 50 Denied.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

## AND FAIR DEALING AGAINST DEFENDANTS P-97, CLB, AND AMA-4

51.    The answers contained in paragraphs 1-50 above are incorporated herein by this reference as if fully restated.

52.    Complaint Paragraph 52 Denied.

53.     Complaint Paragraph 53 Denied.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACT

## AGAINST DEFENDANTS SKOBEL AND AMA-4

54.     The answers contained in paragraphs 1-53 are incorporated herein by this reference

as if fully restated.

55.     Complaint Paragraph 55 Admitted to existence of contract. Denied as to its validity.

56.     Complaint Paragraph 56 Denied.

57.     Complaint Paragraph 57 Denied.

58.     Complaint Paragraph 58 Denied.

59.     Complaint Paragraph 59 Denied.

60.     Complaint Paragraph 60 Denied.

61.     Complaint Paragraph 61 Denied.

62.     Complaint Paragraph 62 Denied.

## COUNT IV

## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

## AGAINST DEFENDANTS SKOBEL AND AMA-4

63.     The answers contained in paragraphs 1-62 are incorporated herein by this reference

as if fully restated.

64.     Complaint Paragraph 62 Denied.

65.     Complaint Paragraph 65 Denied.

66.    Complaint Paragraph 66 Denied.

67.    Complaint Paragraph 67 Denied.

68.    Complaint Paragraph 68 Denied.

69.    Complaint Paragraph 69 Admitted.

70.    Complaint Paragraph 70 Denied.

71.    Complaint Paragraph 71 Denied.

## COUNT V

## ALTERNATIVE CLAIM FOR SPECIFIC PERFORMANCE

## AGAINST DEFENDANT AMA-4

72.    The answers contained in paragraphs 1-71 are incorporated herein by this reference as if fully restated.

73.    Complaint Paragraph 73 is not directed to AMA-4 and Skobel.

74.    Complaint Paragraph 74 Denied.

75.    Complaint Paragraph 75 Denied.

76.    Complaint Paragraph 76 Denied.

77.    Complaint Paragraph 77 Denied.

78.    Complaint Paragraph 78 Denied.

79.    Complaint Paragraph 79 Denied.

With regard to all of the relief requested in the WHEREFORE clauses and all counts of the Plaintiff's Complaint, AMA-4 and Skobel deny that Plaintiff's are entitled to the prayed relief and demand strict proof thereof.

## II. AFFIRMATIVE DEFENSES

1.      **As the managing member of a limited liability company, Skobel is not personally liable for any of his actions that are within the scope of his position as managing member of AMA-4.** Skobel did not have any knowledge of the Amended contract before the formation date of AMA-4. At all times Skobel was acting on behalf of AMA-4. In addition, MDC did not allege any facts that could make Skobel liable for a tort. At no time did Skobel individually enter into any agreement. Accordingly, Skobel cannot be held liable to MDC or P-97 for any alleged liability arising out of any claims.

2.      **AMA-4 and Skobel allege that each and every purported Cause of Action in the complaint are barred because the damages (if any) referred to in the Complaint by MDC were proximately caused by MDC's culpable conduct and at all times relevant herein, MDC failed to exercise for their own protection, the proper care and precautions which prudent persons under the same and similar circumstances would have exercised.**

3.      **MDC's omissions and misrepresentations made in connection with any contracts with P-97 excused and waived any conduct by Defendants and/or bars any recovery or relief to which MDC may have been entitled (if any), in whole or in part.**

4.      **AMA-4 and Skobel allege that each and every purported Cause of Action in the complaint are barred as a result of there being no damages to MDC as damages**

**are too speculative to be recoverable under the governing law.**

5.      **If MDC has suffered any loss, MDC has failed to mitigate and lessen damages and they must bear that proportion of the total loss as it was caused by their own conduct.**

6.      **If MDC has suffered any loss, AMA-4 and Skobel allege that they have incurred damages by reason of MDC's conduct and that it has the right of offset MDC's loss by the amount of AMA-4 and Skobel's damages.**

7.      **AMA-4 alleges that Counts 1 and 2 in the complaint are barred by the Statute of Frauds, Parol Evidence Rule (if it is found to apply), or a general finding of lack of privity of contract between MDC and AMA-4.** AMA-4 has never made any agreement whatsoever with MDC. In addition, there are no written agreements between AMA-4 and MDC and no assignments of any agreements, so the Statute of Frauds provisions of Section 725.01, Florida Statutes should bar the finding of any agreements or assignments. "Pursuant to the statute, no action can be brought to enforce a contract for the sale of land unless the contract is in writing and signed by the party to be charged." Cavallaro v. Stratford Homes, Inc., 784 So.2d 619, 621 (Fla. 5th DCA 2001). MDC fails to allege any facts that could meet the elements required for AMA-4 to be liable for a contract.

8.      **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of the Amended Contract being too vague,**

indefinite, and ambiguous.

9.     **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of a failure to identify or describe with sufficient certainty the legal description of the property to be bought and sold.** AMA-4's copy of the contract was faded and hard to read. In fact, AMA-4 still can't discern from the contract the intended legal description. On AMA-4's copy of the contract it is very hard to understand where the hand drawn line goes as it blends in with the other lines on the map. The hand drawn line is the same color as the other lines on the map and AMA-4 was never sent the original by MDC. P-97 claims to not have a copy of the original. There are no dimensions on the drawing. The law requires that the legal description be determinable and not have factual omissions that leave the boundaries of the property uncertain. The missing dimensions are a factual omission that render the agreement unenforceable.

10.    **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of a failure of consideration.** The deposit money is not where it was specified to be in the contract. This is a material breach in the terms of the contract that renders the deposit money illusory. Legal possession of the deposit money was still in the name of MDC or possibly an attorney selected by MDC. The intent of having the title company escrow the earnest money is usually to get a neutral escrow agent that would likely not take the risk of resolving an escrow dispute on its own judgment and act independently by interpleading the deposit in case of any dispute. MDC's selection of the attorney gave them an uncontracted for advantage if an escrow dispute arose. As

further evidence of the illusory nature of the deposit, MDC claims that the $20,000.00 they deposited was fully refundable for at least 316 days.

11.    **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of the Amended Contract being unenforceable because of frustration of purpose of the Amended Contract.**

12.    **AMA-4 alleges the Amended Contract should be construed against MDC, the drafting party.**

13.    **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of the invalid use of the Section 8 extension in the Amended Contract resulting in the expiration of the Amended Contract on November 16, 2012.**

14.    **AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of the Plaintiff failing to tender the Purchase Price for the property which is a condition precedent to this action under Florida law.**

15.    **In the alternative that AMA-4 is liable under the Amended Contract, AMA-4 alleges that each and every purported Cause of Action in the complaint are barred as a result of MDC breaching the Amended Contract.** MDC had anticipatorily repudiated the contract with respect to AMA-4 by refusing to send them all contract related documents making it impossible for AMA-4 or their closing attorney to figure out the scope of the transaction. Although MDC asked for a "title commitment" and all matters

affecting the title to the property, MDC knew this request would be impossible to comply

with as the legal description of the property was inadequate and a title insurance agent

would not issue a title commitment without a determinable legal description. AMA-4 asked

for the necessary contract that their closing agent would need to close on the property.

Refusal to comply with this request violated the requirement from the Amended Contract

that "[t]he parties hereto agree that they will each take such steps and execute such

documents as may be reasonably required by the other party or parties to carry out the

intents and purposes of this Agreement." AMA-4's closing agent required a clarification of

the legal description and other ambiguous terms to be able to close the transaction.

AMA-4's closing agent would not be able to close MDC's Amended Contract without new

contract paperwork specifying the essential terms. MDC's refusal to even see what AMA-4

was offering was a breach of contract. The claims by MDC that AMA-4 anticipatorily

breached the contract are false. Although, AMA-4's attorney did let MDC know of the

issues the attorney felt were a problem in the contract, the same email offered to cure the

issues with a new contract. Thus, MDC was never excused from performing with respect

to AMA-4, and MDC breached the contract. In addition, MDC let any and all possible

deadlines under the agreement pass without adequately preparing for closing. MDC violated

the time is of the essence provision of the contract by not meeting the required deadlines.

16.     **In the alternative that AMA-4 is liable under the Amended Contract, AMA-4**

**alleges that each and every purported Cause of Action in the complaint are barred**

**as a result of the Amended Contract being substantially performed by AMA-4 as**

**they were ready willing and able to close.**

17.     **Any recovery or relief to which MDC may have been entitled (if any) under Count 5 is barred, in whole or in part, under the doctrine of unclean hands.** MDC's litigation of the Proposed Second Amendment is in bad faith and shows that if AMA-4 would not have been able to close the Amended Contract without agreeing to the Proposed Second Amendment or facing the risk of future litigation.

18.     **AMA-4 alleges that Count 2 of the complaint is barred because a claim for breach of the covenant of good faith and fair dealing may be deemed redundant and dismissed where the claimed damages are intrinsically tied to the damages sought under a breach of contract claim.**

19.     **AMA-4 alleges that Count 2 of the complaint is barred because MDC did not specify the explicit terms in its contract that were breached under the Implied Covenant of Good Faith and Fair Dealing which is an essential requirement of that cause of action.**

20.     **AMA-4 and Skobel allege there can be no claim for tortious interference with a business relationship or contract where the action complained of is undertaken to safeguard or promote one's financial or economic interest.** Barco Holdings, LLC v. Terminal Inv. Corp., 967 So. 2d 281, 293 (Fla. 3d DCA 2007).

21.     **AMA-4 and Skobel allege there can be no claim for tortious interference with a business relationship or contract where the action complained of is**

**undertaken within their scope of employment under AMA-4 and are thereby**

**privileged.**

22.     **AMA-4 and Skobel never acted in a tortious or improper manner. Plaintiff**

**has not alleged facts that could be construed as a tort. In addition, fraud or malice is**

**a missing required element of the tort claims.** John B. Reid and Associates, Inc. v.

Jimenez, 181 So.2d 575 (Fla.3d DCA 1965), Andrew P. Serafino v. Palm Terrace

Apartments, Inc., 343 So.2d 851 (Fla.2d DCA 1976).

23.     **AMA-4 and Skobel allege that each and every purported Cause of Action in**

**the complaint are barred because the damages (if any) referred to in the Complaint**

**by MDC were proximately caused by P-97, and that if AMA-4 committed any**

**wrongful act at all (which supposition is made for the purpose of their defense**

**without admitting such to be a fact), the aforesaid conduct of P-97 toward MDC**

**contributed to the happenings of MDC's alleged damages. Accordingly, the liability**

**of the responsible party, P-97 should be apportioned according to their respective**

**degrees of fault or other legal responsibility, and the liability, if any, of AMA-4**

**should be reduced accordingly.**

24.     **AMA-4 was indemnified by P-97 for any damages associated with the**

**Amended Contract. This indemnification extended to any other encumbrances**

**created by P-97's actions prior to selling the property to AMA-4.** P-97 has contracted

for indemnification on both the Warranty Deed and the Corporate Owner's Affidavit signed

at closing. The Closing Statement addendum guaranteed that the "subject to an existing/pending contract" term would not survive the closing. P-97 agreed both verbally and in writing that AMA-4 would not be assigned the Amended Contract.

25.     **AMA-4 and Skobel reserve the right to plead additional defenses (or crossclaims or counterclaims) that may be identified during investigation and/or course of discovery.**

### III. COUNTERCLAIMS AND CROSSCLAIMS

Defendant and Counterclaimant, AMA Gainesville Investments Four, LLC ("AMA-4") by and through its undersigned counsel, hereby counterclaims against Plaintiff and Counter-Defendant, Market Development Corporation ("MDC") and sues Defendant and Cross-Defendant, Partnership 97, Ltd. ("P97") and CLB, Inc. ("CLB"). P97 and CLB shall be collectively referred to as P-97. AMA-4 respectfully alleges as follows:

### PARTIES AND JURISDICTION

1.     Defendant and Counterclaimant, AMA-4 is a Florida limited liability company with its principal place of business at 8819 SW 74th Avenue, Gainesville, Alachua County, Florida 32608. Alex Skobel ("Skobel") is AMA-4's managing and sole member who, resides in Alachua County, Florida.

2.     Plaintiff and Counter-Defendant, MDC is a Georgia corporation, with its principal place of business in the State of Georgia at 4200 Northside Parkway, N.W., Building Two, Suite 200, Atlanta, Georgia 30327.

3.      Defendant and Cross-Defendant, P97 is a Florida limited partnership with its general partner being Defendant CLB. P97's principal place of business is 5517 S.W. 69th Terrace, Gainesville, Alachua County, Florida, 32608. The partners that comprise P97 reside in the State of Florida or in states other than Georgia.

4.      Defendant and Cross-Defendant, CLB is a Florida for profit corporation organized and operating under the laws of the state of Florida, and has its principal place of business at 5517 S. W. 69th Terrace, Gainesville, Alachua County, Florida 32608. At all times material hereto CLB acted on behalf of P97 as its general partner.

5.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332(a)(1), in that complete diversity of citizenship exists between Defendant and Counterclaimant and the Plaintiff and Counter-Defendant and the amount in controversy could exceed $75,000.00, exclusive of interest and costs.

6.      Venue is proper in the Gainesville Division of the United States District Court for the Northern District of Florida in that, among other things, the contract at issue in this action was to be performed in Gainesville, Florida, one or more Defendant, Counter-Defendant, and Counterclaimant reside in the Gainesville Division of this District, and all or a substantial part of the events and acts of the parties giving rise to the claims described herein occurred in the Gainesville Division of this District.

7.      All conditions precedent to the maintenance of each of the causes of action alleged herein have been complied with, have occurred either in fact or by operation of law, or have been waived.

## FACTUAL ALLEGATIONS

8.      On March 5th, 2012, P-97 signed a Sales Contract with MDC that initialized a 150 day due diligence period for MDC to research and evaluate the feasibility of a piece of commercial property in Brytan.

9.      On July 24th, 2012, MDC and P-97 signed an Amended Sales Contract (the "Amended Contract") to extend the timeframe of MDC's 150 day due diligence period from August 2nd, 2012 to October 17th, 2012.

10.     On October 5th, 2012, AMA-4 entered into contract (the "P-97/AMA-4-Contract") with P-97 and Brice Development, Inc. for the Brytan subdivision located in Alachua County, Florida.

11.     All of the commercial and residential property in Brytan including approximately 700 residential units were transferred to AMA-4 under the P-97/AMA-4-Contract.

12.     A small portion of the property P-97 owned and sold to AMA-4 was the real property (the "Property") that is the subject of MDC's Complaint. A true and accurate copy of the P-97/AMA-4-Contract is Complaint Exhibit "3."

13.     P-97's realtor wrote in the P-97/AMA-4-Contract that it was "subject to an existing/pending contract," of which was the Amended Contract between MDC and P-97.

14.      AMA-4's contract was "subject to" rather than "assigned to" the Amended Contract, thus AMA-4 had believed in absence of a closing or new agreement with P-97, any rights MDC may have had would be toward P-97. AMA-4 would be subject to a closing, which would mean AMA-4 would no longer be able to buy the Amended

Contract's property and AMA-4's purchase price would be reduced accordingly. AMA-4 was not to be assigned the liability if that closing did not happen.

15.    On October 5th, 2012, the same day that AMA-4 signed the P-97/AMA-4-Contract, P-97 emailed AMA-4 "Next week we need to discuss whether you want to give the Atlanta group until December 7, 2012.  If you want to keep that deal, it would probably be a good idea to give them that extension so that the deal does not come to a stand still on the 17th of October."

16.    P-97 was representing when the contract was signed that AMA-4 would not be bound by the Amended Contract beyond AMA-4's closing. P-97 informed AMA-4 that no extension had currently been negotiated. P-97 informed AMA-4 that MDC was not likely to be able to close by the contract deadline.

17.    On October 9th, 2012, P-97 emailed to MDC the following: "Gentlemen- As way of introduction, this email is to assist in opening up communication between the two of you. Alex is a regional developer focusing on Gainesville the past few years.  His company purchased the Grand Preserve of Kanapaha, which connects with Brytan.  Bob is part of Market Development Corp out of Atlanta.  They work with large regional and national tenants. If Sara or I can be of any assistance, please let us know." This was the first time AMA-4 and MDC had been put in touch.

18.    AMA-4 and P-97 decided together that neither would be interested in signing the Proposed Second Amendment and extending the Amended Contract with a completely refundable deposit again. AMA-4 verbally asked P-97 not to do anything that could change

the deal with MDC, without its knowledge, while under contract with AMA-4.

19.     In a telephone conversation with AMA-4, MDC was trying to sell AMA-4 on the idea of accepting their Proposed Second Amendment. AMA-4 listened and asked questions but refused to make any decisions during his first and only phone call with MDC.

20.     P-97 emailed AMA-4 on October 18th, 2012 the following: "Alex- I emailed the Atlanta Group this morning stating that our office did not receive notification requesting an extension per the Sales Contract. Additionally, I noted that our office had not received notification of termination from them. Therefore, the closing date should be Nov 16, 2012 or sooner per the Sales Contract. I expect that they will terminate and then I will request the Earnest Money because they did not let us know in writing by October 17th. I will let you know once I hear from them." AMA-4 expected the contract to terminate on November 16th, 2012 because P-97 made it sound unlikely that MDC was interested in closing this transaction per the Amended Contract.

21.     In discussions and negotiations between October 19th, 2012 and October 23rd, 2012, AMA-4 let P-97 know they did not want to have any encumbrances on title including any claims from MDC's Amended Contract. AMA-4 could not understand the vague ambiguous terms of the Amended Contract.

22.     AMA-4 suggested clarifying that the contract was breached with MDC. P-97 was not interested in resolving the breach with MDC because they were still willing to close on or before November 16th, 2012 with MDC and they felt discussing the breach with MDC could create more issues than it would resolve.

23.     On October 24th, 2012, P-97 advised AMA-4 to wait until the expiration on

November 16th, 2012 and brought up assigning the contract to AMA-4 was possible. This

was the first time P-97 start negotiating for an assignment of contract. AMA-4 was against

having the contract assigned. However, this negotiation led AMA-4 to examine MDC's

Amended Contract. Upon examination, AMA-4 noticed and pointed out to P-97 the deposit

money was misappropriated in the contract.

24.     P-97 agreed with AMA-4 that the misappropriation was a problem, but did not want

to use that problem toward invalidating the contract at that time. P-97 did not want to

jeopardize a deal with MDC during AMA-4's due diligence period.

25.     Against the advice of AMA-4, that the misappropriation of the earnest deposit might

invalidate the contract, P-97 decided to offer to MDC the chance to cure this breach of

contract. P-97 made it clear that AMA-4 did not have any negotiating power to influence

their decisions.

26.     On October 30th, 2012, P-97 emailed AMA-4's attorney the following: "Michael-

Sara and I spoke with Melissa regarding your request to send your letter to Market

Development Corp.  While I am not comfortable sending the letter that you drafted, I am

willing to contact them and tell them that we just realized that the monies were not

deposited with First American Title Insurance Company and that I need them to have them

deposited in accordance with the Sales Agreement with First American by November 6,

2012.  I will also request a dated receipt for the deposit. I understand that you and Alex do

not like this contract but I am not in a position to do anything that would jeopardize the

contract in the event that Skobel Homes does not close on the deal.  Please remember that

through the Town Center Declaration, Skobel Homes will have a tremendous amount of

control over the deal—everything from which trees can be removed, architectural control,

etc. – to make the deal unattractive. I will work with you as much as I can but I can't take

steps to terminate the contract with Market Development Corp. I will send the email to

them this afternoon regarding the deposit and copy you and Alex. Respectfully, Alison." A

true and accurate copy of the email is attached hereto and incorporated herein by this

reference as AMA Exhibit "1."

27.    Subsequently on October 30th, 2012, P-97 sent MDC the following email:

"Gentlemen-What is your anticipated closing date? We recently realized that the Earnest

Money was not deposited into First American Title Insurance Company as required by

Paragraph 2 of the Sales Contract dated March 2, 2012. Instead the Earnest Money was

deposited into an Attorney's Escrow Account. Please have the Earnest Money deposited

with First American Title Insurance Company by November 7, 2012 and provide us with

dated receipts. Respectfully, Alison Cox." A true and accurate copy of the email is attached

hereto and incorporated herein by this reference as AMA Exhibit "2."

28.    On October 30th, 2012, MDC responded to P-97 with the following email: "Alison-

the earnest money has been deposited with Mike Schaaf who is, in fact, an attorney, but he

is an authorized agent for First American Title Insurance Company. He will gladly provide

you with an "insured closing" letter which will confirm that he is an authorized agent for

First American. The deposits were delivered to Mr. Schaaf on a timely basis and you

received written notice each time that a deposit was made. You made no objection to Mr. Schaaf holding the deposits as an agent of First American. We see no reason to move the deposits at this time. Assuming you receive an insured closing letter from First American, does your request to move the deposits to First American still stand? Please let me know. Thanks. Joel." See AMA Exhibit "2."

29.     Alison directed Joel to communicate with AMA-4 but on November 6th, 2012 Joel responded "Alison- we have a contract with you, not Alex. As you heretofore have had no objection to the earnest money being held by First American's agent, Michael Schaaf, we don't intend to transfer the earnest money to another party." A true and accurate copy of the email is attached hereto and incorporated herein by this reference as AMA Exhibit "3."

30.     AMA-4 sent a letter signed by P-97 demanding the deposit to be moved.

31.     On November 7th, 2012, MDC sent an escrow agreement with First American to P-97 which was forwarded to AMA-4. The November 7th, 2012 deadline passed and the deposit remained with Mr. Schaaf.

32.     AMA-4's due diligence period was from contract signing on October 5th, 2012 until November 18th, 2012.

33.     P-97 was worried about AMA-4 not closing, thus P-97 told AMA-4 that they will be making all decisions relative to MDC's Amended Contract. P-97 wanted to keep all options open.

34.     P-97 suggested that AMA-4 do things to make the deal unattractive to MDC in the event they were found to have a valid extension. AMA-4 argued they would not be taking

liability for the Amended Contract if the extension is valid. AMA-4 did not want an assignment of this agreement.

35.     AMA-4 did not want P-97 taking any actions to change the Amended Contract that could affect AMA-4 including extensions or changing terms, but AMA-4 let P-97 do anything they felt they were legally required to do under their contract with MDC.

36.     AMA-4 and Skobel decided to memorialize this agreement in writing. AMA-4 expressed to P-97 what they wanted in a communication agreement, and P-97 ended up drafting a communication agreement that best expressed the intent of the parties.

37.     P-97 signed the Communication Agreement on November 5th, 2012 to memorialize their intent to not change the Amended Contract and to allow P-97 to fulfill the legal requirements of the Amended Contract by preserving the right that P-97 "may communicate through their attorney in the event that some communication is required by the Sales Contract with MDC dated March 2, 2012." The Communication Agreement was meant to avoid any interference with MDC's legal rights under the Amended Contract while simultaneously protecting AMA-4 during a critical time period. This critical time period was when AMA-4 could be subject to the Amended Contract. This time period began when the P-97/AMA-4-Contract was signed. This time period ended when AMA-4's closing documents stated they would not longer be subject to the contract and they would be getting indemnified by P-97 for any encumbrance related to the Amended Contract. A true and accurate copy of the Communication Agreement is attached hereto and incorporated herein by this reference as AMA Exhibit "4."

38.     On November 8th, 2012, P-97 forwarded an email to AMA-4 from MDC that stated MDC planned to use an extension under Section 8 of the Amended Contract.

39.     P-97 told AMA-4 that MDC could not use the Section 8 of Amended Contract extension because the MDC Proposed Improvement did not allow extension of the inspection period.

40.     AMA-4 agreed with P-97's arguments which were as follows. Under Section 8 (iii), the Purchaser's failure to get permits on the "Proposed Improvements," which was defined as a "retail store" in the contract, should not allow this extension. Purchaser was no longer pursuing getting permits on a retail store that was the original purpose of the contract. When MDC could not get a firm commitment from a "retail store," there was a frustration of purpose on the Amended Contract between P-97 and MDC.

41.     P-97 told AMA-4 that the Brytan Commercial Association had not approved of the deal with McDonalds. When the parties originally contracted, a McDonalds wasn't contemplated. MDC began working on a McDonalds without the consent of P-97 which would be an anticipatory repudiation of the contract. The switch from a "retail store" to a McDonalds will have a significant impact on the entire value of the Brytan project.

42.     Section 8 (i) and (ii) of the Amended Contract should also not activate any extension. P-97 had been ready, willing, and able to close with MDC and had not violated any representations and warranties as of November 16th, 2012. AMA-4 does not see a basis to grant an extension under any term of Section 8 (i),(ii), and (iii) of the Amended Contract.

43.     The evidence shows MDC did not make any attempt to move toward closing on

this contract on or before the November 16th, 2012 Closing Date. P-97 and AMA-4

discussed all the breaches and egregious conduct by MDC, and P-97 said that were

concerned MDC might have a weak claim against them but also understood AMA-4 did not

want liability under the contract.

44.     As the November 27th, 2012 closing approached, AMA-4 and P-97 jointly prepared

the closing documents for the P-97/AMA-4-Contract. AMA-4 specifically negotiated that

there would be no assignment of the Amended Contract.

45.     AMA-4 disputed the validity of the Amended Contract and knew that not having the

Amended Contract assigned meant P-97 would pick up the liability, if any, from the

Amended Contract.

46.     AMA-4 and P-97 exchanged all the closing documents electronically before the

closing to make sure both parties had the opportunity to mark-up and review every

document to be signed at closing. Every single document signed at the closing was emailed

back and forth between AMA-4's closing attorney and P-97's closing attorney before the

closing.

47.     AMA-4 was clear with P-97 and P-97's attorney that all documents must be

reviewed prior to closing. AMA-4 told P-97's attorney, AMA-4 would not do legal analysis

on a new document at the closing table.

48.     In particular, AMA-4 sent a copy of the Corporate Owner's Affidavit Non-Foreign

Certificate and Request for Taxpayer Identification Number (the "Corporate Owner's

Affidavit"), the General Warranty Deed, and the Closing Statement Addendum to be review by P-97's attorney. These documents were created with the intent to avoid any liability from the Amended Contract or any other source of encumbrances P-97 could have know about. P-97's attorney and AMA-4's attorney agreed on the contents of the signed documents.

49.     The General Warranty Deed states, "And said grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2012." A true and accurate copy of the Warranty Deed is attached hereto and incorporated herein by this reference as AMA Exhibit "5."

50.     The negotiated intent of buying the Property with a General Warranty Deed was to avoid encumbrances of the nature of the Amended Contract.

51.     The Corporate Owner's Affidavit states, "The above described Property is free and clear of all liens, taxes, encumbrances and claims of every kind, nature and description of record whatsoever, except for mortgage or mortgages, if any, described in the Deed and all items listed on Old Republic National Title Insurance Co. Commitment with an effective date of 11/21/12 issued by Skobel Law PA." The corporate owner's affidavit also stated, "There have been no documents recorded in the Public Records of Alachua County, Florida subsequent to November 5, 2012, which affect title to the Property and Seller has not

entered into any contracts for the sale, disposition or leasing of the Property since said date except as may have been disclosed to Skobel Law PA in writing, and Seller has no knowledge of any matter affecting title to the Property." A true and accurate copy of the Corporate Owner's Affidavit is attached hereto and incorporated herein by this reference as AMA Exhibit "6."

52.     The Corporate Owner's Affidavit is further evidence that AMA-4 intended to avoid liability from the Amended Contract. In the Corporate Owner's Affidavit, AMA-4 has specifically contracted for avoiding liability for the Amended Contract. P-97 avoided liability for certain exemptions in the Corporate Owners Affidavit including all items in the Old Republic National Title Insurance Co. Commitment with an effective date of 11/21/12 issued by Skobel Law PA (the "Title Commitment"). The Amended Contract is not an item in the Title Commitment. A true and accurate copy of the Title Commitment is attached hereto and incorporated herein by this reference as AMA Exhibit "7."

53.     The Closing Statement Addendum states "Buyer and Seller acknowledge that all of the contingencies required in the Contract have either been met, satisfied, or are hereby expressly waived by the party or parties for whose benefit they were placed in the Contract." This language ensures that the "subject to" clause could not be interpreted as an assignment because all contingencies in the contract were waived at closing. A true and accurate copy of the Closing Statement Addendum is attached hereto and incorporated herein by this reference as AMA Exhibit "8."

54.     However to AMA-4's surprise on closing day, November 27th, 2012, P-97's

attorney showed up with an Assignment of Contract document for the Amended Contract. At the closing table, AMA-4 told P-97 and their attorney we would not sign the Assignment of the Amended Contract. P-97 and their attorney did not object and P-97 said it was "more important we close today."

55.     AMA-4 let P-97's attorney have complete control over all documents being signed, including being the notary for the transaction. P-97's attorney conducted the entire operation of signing the documents. The Corporate Owner's Affidavit, the General Warranty Deed, and the Closing Statement Addendum were all signed. The Assignment of Contract document was not signed by either P-97 or AMA-4.

56.     AMA-4's attorney scanned the signed documents and printed a copy for P-97, which they waited for before leaving the closing.

57.     AMA-4's attorney kept the blank Assignment of Contract document brought by P-97's attorney in his files for his records.

58.     AMA-4 did not see the alleged email by P-97 to MDC saying the contract was assigned.

59.     On January 3rd, 2013, P-97 forwarded a letter that made it clear to AMA-4 that P-97 was alleging assignment of the Amended Contract to AMA-4. In MDC's letter, MDC alleged breach of contract by P-97.

60.     The fraudulent claims from P-97 of an assignment in January came as a surprise to AMA-4 and Skobel. No one contacted AMA-4 from its closing on November 27th, 2012 through January 3rd, 2013 regarding this contract. AMA-4 was never assigned, nor would

have accepted an assignment of the Amended Contract. After MDC began claiming their rights had been infringed through the Section 8 extension, P-97 and its counsel began fraudulently alleging assignment even though AMA-4 has physical evidence there was no assignment.

61.     Although MDC was claiming their rights had been infringed under the Section 8 extension, this claim appears to be in bad faith. MDC was unwilling to work toward closing even within the time frame of the extension.

62.     AMA-4 sent an email on January 27th, 2013 offering to prepare a new contract with MDC. MDC did not address the issue of preparation of a new contract in its response. On January 29th, AMA-4 sent a follow up email that reads in part  "We are trying to offer you an opportunity to close the property under similar terms to the contract you signed with Alison.  We believe the February 14th closing date is already a 90 day extension.  If you want this property, the closing must happen on February 14th, and in order to make that happen, we need to know today for a new, legitimate contract to be produced." MDC rejected this offer. It is clear MDC would not have closed before February 14th under any circumstances. A true and accurate copy of the email is attached hereto and incorporated herein by this reference as AMA Exhibit "9."

63.     As far back as October 2012, MDC indicated if they were going to close, they would want a new amendment with a refundable deposit, that could move the closing date significantly. This amendment would also change the terms of the original agreement to effectively substantially reduce the purchase price and change the legal description. MDC

has breached the Amended Contract.

64.     By reason of the foregoing, AMA-4 has been damaged in the amount to be determined at trial.

## COUNT I

## BREACH OF CONTRACT AND INDEMNIFICATION

## AGAINST P-97 AND CLB, INC. (CROSSCLAIM)

65.     The allegations contained in paragraphs 1-66 above are incorporated herein by this reference as if fully restated.

66.     P-97, CLB and AMA-4 entered in contracts at closing including: the Corporate Owner's Affidavit, the General Warranty Deed, and the Closing Statement Addendum. P-97 and CLB are liable for non-performance of their obligations pursuant to those above mentioned contracts.

67.     AMA-4 fulfilled all or substantially all of its obligations in good faith at the closing of the P-97/AMA-4-Contract.

68.     By the provisions of the written agreements, P-97 had the obligation to deliver the property without encumbrances. P-97 violated the agreements because we now have claims from the lawsuit filed by MDC that are encumbrances on the property. P-97 failed to deliver the property in the manner AMA-4 contracted for in the closing documents.

69.     Therefore, P-97 and CLB each have materially breached their obligations under the above mentioned contracts.

70.     The damages suffered by AMA-4 include, but are not limited to, monetary loss

suffered by AMA-4's loss of the ability to build and/or sell the property, AMA-4's losses if any from any and all claims in this lawsuit including attorneys fees and time expended defending this case. By reason of the foregoing, AMA-4 has been damaged in the amount to be determined at trial and AMA-4 prays for any and all remedies the court determines it is entitled as a matter of law.

WHEREFORE, AMA-4, demands judgment against P-97 and CLB, awarding them damages, including costs, reasonable attorneys' fees, and prejudgment interest, full indemnification and for such other and further relief as this Court deems just and proper.

## COUNT II

## IN THE ALTERNATIVE- BREACH OF CONTRACT AGAINST MDC
## (COUNTERCLAIM)

71.     The allegations contained in paragraphs 1-64 are incorporated herein by this reference as if fully restated.

72.     If in the alternative, the court determines as a matter of law AMA-4 is in a contract with MDC, MDC breached the contract with AMA-4.

73.     At all times relevant, AMA-4 was ready, willing and able to close with MDC, and perform in accordance with the terms and conditions of the Amended Contract. AMA-4 has fulfilled all or substantially all of its obligations in good faith under the Amended Contract, and has been excused from performing any further obligations under the Amended Contract due to MDC's' refusal to perform and outright repudiation of the Amended Contract.

74.     MDC acted willfully, wantonly, intentionally and in utmost bad faith to materially breach and repudiate their obligations under the Amended Contract, including, without limitation, failing and refusing to cooperate with AMA-4 to close the transaction.

75.     In addition, MDC failed and refused to provide AMA-4 a copy of the Contract Agreement to attempt to keep relevant information from AMA-4 and refused to enter privity by the execution of a new contract between MDC and AMA-4.

76.     Through their actions and by virtue of the facts set forth above, MDC has breached the Amended Contract. Accordingly, AMA-4's remedy is to recover all damages allowed under the Amended Contract including but not limited to any earnest money deposit.

WHEREFORE, AMA-4 hereby requests that the Court award AMA-4 damages against MDC as this Court deems just and proper, including prejudgment interest, AMA-4's reasonable attorney's fees, expenses, and costs of litigation.

AND WHEREFORE, AMA-4 demands judgment: (i) awarding to AMA-4 the costs and disbursements of this action; (ii) awarding AMA-4 the relief requested in their First Count (Crossclaim); (iii) awarding AMA-4 the relief requested in their Second Count (Counterclaim); (iv) granting such other relief as this Court deems just and proper; and (v) that the Court enter an award for such additional damages against MDC, P-97, and CLB to which AMA-4 and Skobel may be entitled, together with AMA-4 and Skobel's reasonable attorneys' fees and expenses incurred in connection with this action.

## JURY TRIAL DEMAND

### TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted this 10th day of July, 2013.

BRASHEAR, MARSH & ASSOC. PL

/s/ Bruce Brashear

Bruce Brashear
Florida Bar Number 242497
bbrashear@nflalaw.com
michael@skobel.com
cfagan@nflalaw.com
925 N.W. 56th Terrace
Gainesville, FL 32606
Telephone: (352) 336-0800
Facsimile: (352) 336-0505
Attorney for AMA Gainesville Investments Four LLC and Alex I Skobel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 10th, 2013, a true and correct copy of the

foregoing was filed electronically with the Clerk of the Court using the CM/ECF system,

which will send electronic notification to all counsel of record.

/s/ Bruce Brashear

Bruce Brashear
Florida Bar Number 242497
bbrashear@nflalaw.com
michael@skobel.com
cfagan@nflalaw.com
925 N.W. 56th Terrace
Gainesville, FL 32606

Telephone: (352) 336-0800

Facsimile: (352) 336-0505

Attorney for AMA Gainesville Investments Four LLC and Alex I Skobel